UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ MAY 1 2 2010 ★

BROOKLYN OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT I. TOUSSIE,

                              Plaintiff,

        vs.

SMITHTOWN BANCORP, INC., BRADLEY E. ROCK,
and BRADLEY E. ROCK, JR.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.

**DEFENDANTS' NOTICE OF
REMOVAL PURSUANT TO
28 U.S.C. §§ 1331, 1441 AND
1446**

FEUERSTEIN, J.

WALL, M.J.

        PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441 and

1446 and Local Civil Rule 81.1, Defendants Smithtown Bancorp, Inc. ("Smithtown

Bancorp" or the "Company"), Bradley E. Rock and Bradley E. Rock, Jr. hereby

remove the above-entitled action from the Supreme Court of the State of New

York, County of Kings, to the United States District Court for the Eastern District

of New York.  In support of this Notice, Defendants state as follows:

        1.      Defendant Smithtown Bancorp and certain of its officers and directors

are parties to two purported shareholder class actions currently pending in this

Court – *Waterford Township Police & Fire Retirement System v. Smithtown

Bancorp, et al.*, No.10-cv-00864 (SLT) (RER) and *Yourgal v. Smithtown Bancorp,

et al.*, No. 10-cv-01405 (DGT) (RML) (together, the "Class Actions").

2.     Plaintiffs in the Class Actions assert claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 and Section 10(b) and 20(a) of the Securities Exchange Act of 1934 alleging that Smithtown Bancorp's public disclosures during the period from March 18, 2008 to February 1, 2010 were false and misleading because: (i) the Company understated its loan loss reserves and failed to state certain of its assets at fair value; (ii) the Company improperly delayed the recognition of impaired assets; (iii) the Company's internal and disclosure controls were deficient; and (iv) the Company was engaged in unsafe and/or unsound banking practices.

3.     Currently pending before the Court is the motion of Waterford Township Police & Fire Retirement System and Michael L. Cox for consolidation of the Class Actions, appointment as lead plaintiffs, and for approval of their selection of lead counsel.

4.     On April 22, 2010, nearly two months after the first Class Action complaint was filed in this Court, Robert I. Toussie (the "Plaintiff") filed the above-captioned action in the Supreme Court of the State of New York, County of Kings, Index Number 500161/10 (the "State Court Action"). A Copy of the Summons and Complaint (the "Complaint") in the State Court Action is attached hereto as Exhibit A.

5.      The Complaint in the State Court Action asserts common law fraud under New York law on substantially the same factual allegations as those set forth in the Class Actions.

6.      Plaintiff served Defendants with the Summons and Complaint on April 23, 2010.

7.      Defendants have not answered or otherwise appeared in the State Court Action.

8.      Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants remove this case to the United States District Court for the Eastern District of New York, the Judicial District in which this action is pending.  Removal of this action is appropriate under 28 U.S.C. § 1331 because the Complaint is a civil action arising under the Constitution, laws, or treaties of the United States.

9.      Plaintiff alleges, among other things, that Defendants improperly failed to disclose certain adverse conclusions reached by the Federal Deposit Insurance Corporation ("FDIC") in its annual examination of Smithtown Bancorp as of June 30, 2009, and the resulting Report of Examination ("ROE") that documented the FDIC's conclusions.  *See* Compl., ¶¶ 41-45.

10.     The annual examination that the FDIC conducts of Smithtown Bancorp is required by Section 10(d) of the Federal Deposit Insurance Act.  *See* 12 U.S.C. § 1820(d).

3

11.     Plaintiff's allegation that Smithtown Bancorp should have disclosed the FDIC's examination and ROE to "its investors and the public at large" is contradicted by applicable federal law and regulations, which provide that an FDIC examination is highly confidential, and that the conclusions reached in an examination and an ROE may not be disclosed by any person, including a subject bank and its officers and directors, without the express written consent of the FDIC. *See* 12 C.F.R. § 350.9 ("a bank may not disclose any report of examination or report of supervisory activity or any portion thereof prepared by the FDIC" and "shall not make any representation concerning such report or the findings therein"); FDIC Risk Management Manual of Examination Policies ("Without the FDIC's prior authorization, directors, officers, employees and agents of a bank are not permitted to disclose the contents of a report [of examination]").

12.     The FDIC has advised banks that improper disclosure of examination findings may result in criminal penalties provided for in 18 U.S.C. § 641.

13.     Further, the purpose of the FDIC's annual examination program is to maintain public confidence in the integrity of the banking system and in individual banks, provide the best means of determining the bank's adherence to laws and regulations, protect the financial integrity of the deposit insurance fund, and supply the FDIC with an understanding of the nature, relative seriousness and ultimate cause of a bank's problems and thus a factual foundation to soundly base

4

corrective measures, recommendations and instructions.  FDIC examinations are not designed to protect investors or to ensure the accuracy of public disclosures.

14.     Based on the Complaint, it appears that Plaintiff intends to rely on the FDIC's examination findings to support his claim that Smithtown Bancorp's true financial condition was contrary to its public disclosures.  Plaintiff's reliance on the FDIC's examination of Smithtown Bancorp raises additional issues regarding the nature, accuracy, reliability and purpose of FDIC examinations.

15.     Accordingly, Plaintiff's Complaint sets forth a state-law claim that necessarily raises substantial and disputed federal issues that are best resolved in a federal forum.  Removal is proper because resolution of Plaintiff's claim requires a court to construe the scope of Smithtown Bancorp's duties under the complex federal regulatory scheme governing banking institutions.

16.     This Court may entertain jurisdiction in this matter without disturbing the congressional judgment about the sound division of labor between state and federal courts regarding suits alleging misrepresentations in connection with the purchase or sale of securities, the substantial majority of which already are heard in federal courts.  Removal in this case does not give rise to any risk of an enormous shift of traditionally state cases into federal courts or of substantially increasing the volume of federal litigation.

17.     This Court, therefore, has original jurisdiction of the above-entitled action pursuant to 28 U.S.C. § 1331, and removal of the action to this Court is proper pursuant to 28 U.S.C. § 1441.

18.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) because on April 23, 2010, Defendants were hand served with a copy of the Complaint in the State Court Action. This was Defendants' first receipt of a copy of the initial pleadings setting forth the claim for relief on which this action is based.

19.     As required by 28 U.S.C. § 1446, a copy of all process and pleadings in the State Court Action is attached hereto as Exhibit A.

20.     A copy of this Notice of Removal is being served on Plaintiff through his attorneys.

21.     A copy of this Notice of Removal shall be filed with the Clerk of the Supreme Court of the State of New York, County of Kings, and shall be served on all parties of record in the Class Actions.

WHEREFORE, for the foregoing reasons, defendants Smithtown Bancorp, Inc., Bradley E. Rock and Bradley E. Rock, Jr. respectfully give notice of the removal of the action to this Court, and respectfully request that this action be placed on the docket and proceed in this Court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.

Dated:      New York, New York
            May 12, 2010

                          KATTEN MUCHIN ROSENMAN LLP


                          By:   *William M Regan*
                                _____
                                Bruce G. Vanyo
                                bruce@kattenlaw.com
                                William M. Regan
                                william.regan@kattenlaw.com
                                575 Madison Avenue
                                New York, NY 10022-2585
                                (212) 940-8800 (phone)
                                (212) 940-8776 (fax)


                          *Attorneys for Defendants Smithtown*
                          *Bancorp, Inc., Bradley E. Rock and*
                          *Bradley E. Rock, Jr.*



Ex. A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

ROBERT I. TOUSSIE,

                              Plaintiff,

          -against-

SMITHTOWN BANCORP, INC., BRADLEY E.
ROCK, SR., and BRADLEY E. ROCK, JR.

                              Defendants.

---

Index No.

Date Purchased:  April 22, 2010

Plaintiff designates Kings County
    as the place of trial.

The basis of venue is the
    residence of the plaintiff,
    which is located in this county.

**SUMMONS**

Plaintiff resides at:
290 Exeter Street
Brooklyn, N.Y. 11235-3726
County of Kings

To the above named Defendants:

          You are hereby summoned to answer the Complaint in this action and to serve a copy

of your Answer on the Plaintiff's Attorneys within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

Complaint.

Dated:      New York, New York
            April 22, 2010

                                    CHADBOURNE & PARKE LLP

                                    By_____
                                            Scott S. Balber
                                            A Member of the Firm
                                        Attorneys for Plaintiff
                                        30 Rockefeller Plaza
                                        New York, New York  10112
                                        (212) 408-5100

Defendants' addresses:

Smithtown Bancorp, Inc.
100 Motor Pkwy
Suite 160
Hauppauge, N.Y. 11788-5138

Bradley E. Rock, Sr.
4 Wandering Way
Smithtown, N.Y. 11787

Bradley E. Rock, Jr.
37 Peter Lane
Plainview, N.Y. 11803-5637

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

ROBERT I. TOUSSIE,

                          Plaintiff,

               -against-

SMITHTOWN BANCORP, INC., BRADLEY E.
ROCK, SR., and BRADLEY E. ROCK, JR.

                     Defendants.

---

Index No.

**COMPLAINT**

Jury Trial Demanded

---

Plaintiff Robert I. Toussie ("Toussie"), by and through his attorneys, Chadbourne & Parke LLP, for his complaint against Smithtown Bancorp, Inc. ("SBI"), the parent company of Bank of Smithtown (the "Bank"), Bradley E. Rock, Sr. ("Rock"), and Bradley E. Rock, Jr. ("Rock Jr.") alleges the following:

## NATURE OF THE ACTION

1.     This action arises out of Defendants' desperate and cynical fraudulent scheme to mislead Plaintiff and the investing public by misrepresenting the Bank's financial health and concealing its profound and deepening financial distress.

2.     In its public disclosures and during dozens of telephone conversations directly between Rock and Plaintiff, Defendants painted a rosy picture of the Bank's performance, depicting the Bank as one of the best-managed, safest and most financially sound institutions in the United States.

3.      Rock expressly represented to Plaintiff that, unlike its peers in the banking industry, the Bank had only "two bad loans" and was among the "most stable" banks in the country.  However, Rock's and SBI's statements were wholly fictitious, designed to hide, among other things, a deeply insolvent and irresponsibly underwritten loan portfolio created by none other than Rock's own son, Rock Jr.

4.      Only through the recent cooperation of a senior bank executive who wishes to remain anonymous at this time (the "Informant"), has Plaintiff learned the true extent of Defendants' plot to defraud both investors and federal regulators.

5.      Plaintiff has learned, through the Informant, that Defendants' chicanery involved, among other things, pressuring appraisers to withhold bad news about the Bank's deteriorating loan portfolio until after the end of the financial reporting quarter, loaning defaulting borrowers more money so that they could make interest payments on existing distressed loans (including to borrowers that had abandoned the property), and telling the investing public that all was well even as the Bank's regulators were demanding massive changes to the Bank's risk management and lending policies to address the Bank's flagrant violation of applicable laws and regulations designed to foster the financial stability of federally insured banking institutions.

6.      Accordingly, Plaintiff brings this action to recover the millions of dollars in losses he has sustained as the direct result of Defendants' fraudulent conduct.

## THE PARTIES

7.      Plaintiff Toussie is a resident of Kings County in the State of New York.  Toussie is a real estate investor and entrepreneur.

2

8.      Defendant SBI is a bank holding company incorporated under the laws of the
State of New York and having its principal offices at 100 Motor Parkway, Suite 160, Hauppauge,
New York 11788. SBI owns a single direct wholly-owned bank subsidiary, the Bank, a New
York State-chartered commercial bank. The Bank accounts for virtually all of SBI's assets and
earnings. The shares of SBI are traded on the NASDAQ National Market System.

9.      Defendant Rock is, and was at all relevant times, Chairman of the Board,
President, and CEO of SBI and the Bank.

10.      Defendant Rock Jr. is one of a handful of loan officers of the Bank.

11.      Rock and Rock Jr. were privy to confidential and proprietary information
concerning SBI, its business, finances, products, markets, and present and future business
prospects. They obtained this access via internal corporate documents, conversations and
connections with other corporate officers and employees, attendance at management and/or
board of directors meetings and committees thereof, and through reports and other information
provided to them in connection therewith. In fact, Rock Jr.'s irresponsible lending practices
were a primary cause of the Bank's financial difficulties. Because of their possession of such
information, Rock and Rock Jr. knew that the adverse facts specified herein had not been
disclosed to, and were being concealed from, Plaintiff and the investing public.

## FACTS UNDERLYING PLAINTIFF'S CLAIMS

12.      SBI, through the Bank, provides a full array of consumer and commercial banking
services, accepting deposits, providing trust services, and engaging in secured and unsecured
consumer and commercial lending activities.

13.    In September of 2008, Plaintiff purchased 101,143 shares of SBI stock in a private placement of securities underwritten by Sandler O'Neill & Partners ("Sandler O'Neill"), an investment bank.

14.    In making this purchase Plaintiff relied on offering materials provided to him by Sandler O'Neill, as well as approximately one dozen telephone calls with Sandler O'Neill personnel, who told Plaintiff that the offering materials accurately represented SBI's affairs and that Plaintiff was fortunate to have the opportunity to purchase SBI shares. On information and belief, Sandler O'Neill, at the very least, failed to perform proper due diligence to ensure that the private placement memorandum and other offering materials related to the September 2008 offering were not materially misleading, as set forth below. Upon further information and belief, Sandler O'Neill was recommending SBI stock to the public while selling its own stake in SBI to avoid the prospect of sustaining its own losses.

15.    Prior to purchasing SBI shares in the September 2008 offering, Plaintiff performed extensive due diligence, conducting a careful review of SBI's offering materials and speaking on more than a dozen occasions with Rock concerning the financial health, business practices, and business prospects of SBI and the Bank.

16.    In particular, and without limitation, prior to purchasing SBI shares in September 2008, Plaintiff reviewed SBI's then-current filings with the United States Securities and Exchange Commission ("SEC") on Forms 10-K and 10-Q, as well as SBI press releases issued in 2008.

4

17.     Plaintiff made at least 250 additional purchases of SBI stock throughout 2008 and 2009, purchasing hundreds of thousands of shares of SBI stock. Plaintiff routinely reviewed and relied upon SBI's press releases and SEC filings during this time. On information and belief, in 2009, Plaintiff was SBI's single largest individual shareholder. Accordingly, Plaintiff lost millions of dollars as a result of the fraudulent conduct set forth herein.

18.     Plaintiff spoke to Rock on approximately three dozen occasions in 2008 and 2009. During these conversations, Rock made a variety of factual representations that were calculated to, and did, induce Plaintiff to purchase SBI stock. For example, prior to Plaintiff's September 2008 purchase of more than 101,000 SBI shares in a public offering, Rock told Plaintiff that SBI stock was "a steal at $14," that the stock was undervalued, and that he would purchase more SBI stock himself if he were permitted to.

19.     Rock also told Plaintiff that the Bank had only two "bad loans," that all of its other loans were healthy, that the Bank was the "best bank in the country," that the Bank was "exceptionally sound," and that SBI and the Bank were "not suffering from the effects of weak real estate markets in any significant way."

20.     This deceptive posturing continued well into 2009 as Rock continued to state that the Bank had only a "tiny number of bad loans," that the Bank was very well-capitalized, that the Bank's loan loss reserves were reasonable and appropriate, that the Bank was in "exceptional financial health," that the Bank was "exceptionally sound and extremely safe," and that SBI and the Bank were not experiencing significant negative effects from the national economic downturn or from distressed real estate markets.

5

21.     Each of Plaintiff's purchases of SBI stock were made in reliance upon the statements of Rock as set forth above, as well as the press releases and SEC filings of SBI as set forth in paragraphs 48 through 73 below. Had SBI and Rock not made such statements, Plaintiff would not have purchased SBI shares.

22.     SBI's public statements, including its press releases and filings with the SEC also painted a rosy picture of SBI's earnings, loan losses, capitalization, and financial stability. As set forth in detail in paragraphs 48 through 73 below, until late 2009 SBI and Rock represented to the SEC and the investing public that SBI was one of the nation's healthiest banks, had minimal delinquent and non-performing loans, was generating solid earnings, and had stringent and effective internal controls, including disclosure controls.

23.     The truth was far different: in 2008 and 2009, SBI was a deeply distressed institution, experiencing a substantially greater volume of distressed and defaulted loans, a substantially weaker capital position, and substantially lower earnings than reflected in its public statements and in the statements of Rock to Plaintiff. SBI's difficulties were accounted for in large measure by its, and the Bank's, lax and ineffective internal controls and the Bank's reliance upon Rock Jr., an inexperienced loan officer, to make a large volume of now-delinquent loans -- practices that were directly contrary to SBI's statements made in its public statements and filings concerning its lending practices and internal controls. Upon information and belief, the full extent of the Bank's financial distress has still not come to light, and the Bank's financial condition continues to deteriorate at a pace that still has not been fully disclosed to the investing public.

6

## DEFENDANTS "PULL OUT ALL STOPS" TO HIDE SBI'S MOUNTING LOSSES

24.     The Informant has confirmed that, contrary to the rosy picture provided in its press releases and SEC disclosures, beginning, at the latest, in the third quarter of 2008, the Bank was concealing the deteriorating health of its loans through the use of a variety of improper and deceptive practices.

25.     According to the Informant, during 2008 and 2009, "at a [financial] reporting quarter end, *'all stops' were pulled out to reduce overall portfolio delinquency,*" in other words, Defendants were masking the percentage of the Bank's outstanding loans that were past due.

26.     Defendants' efforts to "pull out all stops" to conceal the Bank's deteriorating loan quality included, according to the Informant, a pattern and practice of "advancing funds on . . . credit facilities to pay all interest due current on all related loans, irrespective of whether any actual construction progress had taken place . . . [and] construction projects that were effectively abandoned by the borrower . . . were brought current through such interest reserve advances." By engaging in these fraudulent "interest reserve advances," the *Bank enabled distressed borrowers to remain nominally current by paying interest to the Bank using the Bank's own money* and despite the borrowers' ongoing breaches of loan agreements with the Bank and even their abandonment of the relevant projects. The effect of this pattern and practice was, according to the Informant, "to reduce the overall appearance of delinquent and/or non-performing levels of loans and criticized/classified assets."

27.     According to the Informant, during 2008 and 2009, the Bank knowingly commissioned and received a significant number of fraudulent real property appraisals that

7

substantially overstated the value of the collateral underlying the Bank's real property loans. The Bank knew that the fraudulent appraisals it had commissioned were reckless and rife with methodological defects, including the failure to properly search title records as needed to determine whether recent prior sale prices for the property in question were reliable. In each such case, as detailed more fully in paragraphs 34 through 39 below, re-appraisals, resulting in valuations substantially lower than the amount the Bank was owed, were verbally communicated to the Bank before November 13, 2009. However, these lower appraisals were not delivered until after that date, pursuant to Rock's directive to delay receipt of written appraisals in order to enable the filing of a false and misleading SEC Form 10-Q for the third quarter of 2009.

28.    According to the Informant, at the end of 2007, Rock mandated that the Bank's loan officers increase the Bank's outstanding loans to match the Bank's breakneck pace of deposit growth. As a result, the Bank's loans grew, according to the Informant, in an "unmanageable manner," while "reserves against those loans grew at a much slower pace," resulting in "an unrealistically low level of reserves" against new loans.

29.    On information and belief, during 2008 and 2009, the Bank granted new loans to a variety of borrowers who were already in the early stages of default, and who the Bank knew could not repay either their pre-existing or their new loans. These extensions of new credit to borrowers in default were made with the intention of masking the fact that the Bank had defaulted loans on its books. This conduct further served to delay disclosure of the extent of the Bank's defaulted loans so as to induce investors such as Plaintiff to purchase the Bank's shares at inflated and fraudulent values.

30.    The large and growing risks in the Bank's loan portfolio were exacerbated by the reckless decision of Rock to hire his son, Rock Jr., to serve as one of a handful of loan officers responsible for major credit decisions.  Rock Jr., having graduated from college in 2007, had little or no relevant industry or professional experience and was grossly underqualified to perform credit evaluations or to make decisions and recommendations accounting for a large portion of the Bank's new loans in 2008 and 2009.

31.    In fact, according to the Informant, approximately two-thirds of the loans made on Rock Jr.'s recommendation are delinquent, and these delinquent loans account for a large portion of the loan losses that have depleted the Bank's capital and decimated its earnings.

32.    According to the Informant, Rock and Rock Jr. routinely conferred, outside of the Bank's loan committee, regarding the loans recommended by Rock Jr.  These regular conferrals were intended to conceal the Bank's growing portfolio of bad loans and rendered the presentation of these potential loans to the Bank's loan committee a mere formality, intentionally circumventing an important aspect of the Bank's internal controls over lending decisions.

33.    According to the Informant, Rock's efforts to hide the extent of the Bank's loan losses, many of which had been occasioned by his son's reckless lending decisions, were motivated by a desire to protect Rock Jr. from the negative consequences of having been responsible for the Bank making an extraordinary number of delinquent loans.

### SBI'S FRAUDULENT DELAY OF WRITTEN APPRAISALS

34.    The Informant has advised that, in or about August or September 2009, Rock held a meeting with the Bank's loan officers during which he stated that the FDIC had required the

9

Bank to re-appraise the property securing dozens of the Bank's loans. Rock specifically directed, in the course of their meeting, that any new property appraisals should not be delivered to the Bank before November 13, 2009, the date upon which the Bank was expected to file its SEC Form 10-Q disclosure for the third quarter of 2009.

35.    The Informant has further advised that Rock directed that the Bank's FDIC-mandated reappraisals be intentionally delayed in order to forestall disclosure to the investing public of the devastating losses associated with the re-appraised loans.

36.    As a result of Rock's deceitful directives, clear instructions were provided verbally to appraisers and the Bank staff that no written appraisal reports were to be delivered to the Bank before November 13, 2009.

37.    The Informant advises that the Bank was, in many cases, verbally made aware before November 13, 2009 that the appraisals in question would provide value estimates significantly lower than the indebtedness owed the bank on each individual loan.

38.    After the meeting referenced in paragraph 34 above, Rock spoke repeatedly with Plaintiff and stated that the Bank's loans were performing well. During these conversations with Plaintiff, Rock at no point disclosed the FDIC mandate to re-appraise dozens of loans, or the directive that Rock had issued to the Bank's staff to deliberately hold the re-appraisals until the bank had filed its Form 10-Q for the third quarter of 2009.

39.    As a result of the practices described above, SBI's 2008 and 2009 public financial statements were materially false and misleading in that they, among other things, materially understated loan losses, overstated assets, and overstated earnings. Rock's direct statements to

10

Plaintiff were also materially false and misleading as a result of the practices described above. These misrepresentations and omissions were intended to, and did, induce Plaintiff to purchase additional SBI shares.

      40.     Given the practices set forth above, the Company's announced financial results, as set forth in paragraphs 46 through 73 below, were in violation of GAAP and the following principles:

a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, 10);

b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, 40);

d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, 42);

e)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, 50);

f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2, 58-59);

g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (FASB Statement of Concepts No. 2, 79); and

h)      The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" (FASB Statement of Concepts No. 2, 95).

## THE FDIC AND NYSBS EXAMINATIONS AND ORDERS

41.     Unbeknownst to the Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") performed an examination of the Bank's condition as of June 20, 2009 and thereafter provided the Bank and SBI with its Report of Examination (the "ROE"). The ROE's conclusions were devastating for SBI. The unsafe and unsound banking practices identified in the ROE resulted in the Bank being forced to agree to a January 29, 2010 Consent Order (the "FDIC Order") which mandated far-reaching changes to, *inter alia*, the Bank's management processes, lending policies, and loss recognition and loan reserve practices.

42.     In particular, the FDIC Order directed the Bank to take a number of steps, including the suspension of all dividends, the cessation of the Bank's practice of extending additional credit to borrowers in default, the reduction of the Bank's exposure to commercial real estate lending, strengthening of the Bank's inadequate capital, and the imposition of heightened duties on the Bank's Board to oversee the Bank's operations and its management, including Rock and Rock Jr.

43.     The FDIC Order required the Bank to take all necessary steps "to correct and prevent *the unsafe and unsound banking practices and/or violations of law and regulation, and all contraventions of federal banking agency policies and procedures . . . that were identified in the ROE*."

12

44.     An Order of the Superintendent of Banks of the State of New York ("NYSBS")
was entered on the same day as the FDIC Order and imposed similar restrictions upon the Bank
and its management.

45.     Prior to their public release by the FDIC and the NYSBS, Defendants did not
disclose the FDIC's conclusions to SBI's investors or to the public at large.

### SBI'S MISLEADING PUBLIC DISCLOSURES

46.     SBI's public disclosures and SEC filings in 2008 and 2009 intentionally made no
mention of the irregular accounting, hidden loan losses, inadequate capital, and other chicanery,
and they avoided recognition of the defaults, chronicled above.  Instead, as set forth below, SBI
consistently reassured investors that all was well, that the Bank's financial condition was sound,
it was well capitalized, it had minimal loan losses and delinquencies, and its internal controls
were functioning well.

47.     On March 13, 2008, SBI filed with the SEC its Form 10-K for the year ended
December 31, 2007, which Rock signed.  This filing included the following representations
about the Company's disclosure and internal controls as well as Rock's certifications thereon:

Disclosure Controls and Procedures

An evaluation was performed under the supervision and with the participation
of the Company's management, including the Chief Executive Officer and
Chief Financial Officer, of the effectiveness of the design and operation of the
Company's disclosure controls and procedures (as defined in Rule 13a-15(e)
promulgated under the Securities and Exchange Act of 1934, as amended) as

of December 31, 2007.  *Based on that evaluation, the Company's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Company's disclosure controls and procedures were effective.* [1]

Report by Management On Internal Control Over Financial Reporting

Management of Smithtown Bancorp, Inc. is responsible for establishing and maintaining an effective system of internal control over financial reporting. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  There are inherent limitations in the effectiveness of any system of internal control over financial reporting, including the possibility of human error and circumvention or overriding of controls.  Accordingly, even an effective system of internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation.

\*   \*   \*

Management assessed the Company's system of internal control over financial reporting as of December 31, 2007.  This assessment was based on criteria for effective internal control over financial reporting described in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.  *Based on this assessment, management believes that, as of December 31, 2007, the Company maintained effective internal control over financial reporting based on those criteria.*

\*   \*   \*

*There has been no change in the Company's internal control over financial reporting during the quarter that has materially affected, or is reasonably*

---

[1]   Unless otherwise noted, all emphasis is added.

14

*likely to materially affect, the Company's internal control over financial reporting.*

        *   *   *

I, [Rock], certify that:

1.    I have reviewed this report on Form 10-K of Smithtown Bancorp;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.    The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

    a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.       disclosed in this report any change in the Registrant's internal controls over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal controls over financial reporting.

5.       The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the Registrant's auditors and the audit committee of Registrant's Board of Directors (or persons performing the equivalent function):

a.       all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b.       any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls over financial reporting.

48.       These representations about the Company's disclosure and internal controls, and

Rock's certifications thereon, were repeated in all material respects in Forms 10-K and 10-Q that

SBI filed with the SEC until at least December 31, 2009.

49.       Defendants issued a host of press releases in furtherance of their active efforts to

deceive the public. On April 24, 2008, SBI issued a press release announcing its earnings for the

quarter ended March 31, 2008, which stated, in pertinent part:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the first quarter of 2008 of $3,573,886, or $.37 per share.  These figures represent a

6% increase in net income and a 6% increase in basic earnings per share. Basic earnings per share for the last twelve months now stand at $1.49.

*   *   *

*Asset quality remained strong.  Nonperforming loans were .14% of total loans at the end of the quarter.*  The small increase of 7 basis points in nonperformers from $687,000 at December 31st to $1.6 million at March 31st is attributable to one relationship where the borrower has died and the loans are well-secured by multiple properties.  The Bank does not hold any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates.

Defendant Rock commented on the results, stating in pertinent part as follows:

It has become clear that the current economic environment is creating opportunities for us. Many of our competitors have had to curtail lending due to capital constraints or liquidity constraints caused by sub-prime mortgage problems and other difficulties.  As a result, we have greatly increased opportunities for permanent commercial mortgage lending.  Most of these loans are on fully-tenanted commercial and multi-family buildings with seasoned cash flows. Because of recent Fed rate cuts and *the high quality of these loans*, the rates on these loans are somewhat lower than what we are accustomed to, but the volume of these loans available to us is unprecedented for our Company. Last year, loans grew by $135 million. For the first quarter of this year, loans grew by $140 million. We expect these increased lending opportunities to continue for the near future, which should allow us to build a significantly increased revenue stream.

50.     In response to Defendants' positive statements, the price of SBI common stock

rose 4.1%, to close at $19.43 per share.

51.     On May 8, 2008, SBI filed with the SEC its Form 10-Q for the quarter ended

March 31, 2008 (the "2008 Q1 Form 10-Q"), which was again signed by Rock.  The 2008 Q1

Form 10-Q included SBI's financial statements for the quarter ended March 31, 2008, which

were represented to have been presented in conformity with U.S. GAAP.

In addition, the 2008 Q1 Form 10-Q represented that:

17

In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

52.    On July 17, 2008, SBI issued a press release announcing its earnings for the

quarter ended June 30, 2008, which stated, in pertinent part:

Smithtown, NY, July 17, 2008 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the second quarter of 2008 of $3,952,503 or $.40 per share. These figures represent an 8% increase in earnings on a year over-year basis and an 11% increase in earnings on a linked-quarter basis. Basic earnings per share for the last twelve months now stand at $1.51.

*    *    *

*Asset quality remained very strong.*  Nonperforming loans were $2.8 million or .21% of total loans at the end of the quarter. The increase of 7 basis points in nonperformers from March 31st is attributable to one single-family construction loan which management believes is well-secured. Loans 30-89 days past due were at $150,000, or .01% of total loans. Net charge-offs for the first six months were $1,400, or .0001% of average total loans.

The Bank does not hold any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates. *The Company's capital ratios also remained strong.*  All of the Company's regulatory capital ratios are in the "well capitalized" range, with Tier I Leverage at 7.71%, Tier I Risk-Based Capital at 8.67% and Total Risk-Based Capital at 10.36%. *The Company regularly monitors its capital ratios and evaluates all of its options in light of its asset growth, earnings growth and market conditions at the time.*

Defendant Rock commented on the results, stating in pertinent part as follows:

The current economic environment and competitive environment in our market area continues to create opportunities for us. Many of our competitors have had to curtail lending due to capital constraints or liquidity constraints caused by sub-prime mortgage problems and other difficulties. Other competitors have been acquired by large, out-of-state companies that are much less focused on mortgage lending in our market area. Finally, the 'conduit' market for commercial mortgage loans has dried up entirely. As a

18

result of these multiple factors, we have greatly increased opportunities for permanent commercial mortgage lending.  The loan mix in our portfolio is shifting toward more loans on fully-tenanted multi-family and commercial buildings with seasoned cash flows.  We are pleased with this shift because it enables us to *continue to grow our loan portfolio while maintaining the strong credit quality that has been a hallmark of our Company for many, many years.*

53.     In response to Defendants' positive statements, the price of SBI common stock

rose 7.5%, to close at $18.23 per share.

54.     On August 8, 2008, SBI filed with the SEC its Form 10-Q for the quarter ended

June 30, 2008, (the "2008 Q2 Form 10-Q"), which was again signed by Rock.  The 2008 Q2

Form 10-Q included SBI's financial statements for the quarter ended June 30, 2008, which were

represented to have been presented in conformity with U.S. GAAP.  In addition, the 2008 Q2

Form 10-Q represented that:

- *In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.*

- Our determination of the allowance for loan losses is a critical accounting estimate because it is based on our subjective evaluation of a variety of factors at a specific point in time and involves difficult and complex judgments about matters that are inherently uncertain.  In the event that management's estimate needs to be adjusted based on, among other things, additional information that comes to light after the estimate is made or changes in circumstances, such adjustment could result in the need for a significantly different allowance for loan losses and thereby materially impact, either positively or negatively, the Bank's results of operations.

  The allowance for loan losses is established and maintained through a provision for loan losses based on probable incurred losses inherent in the Bank's loan portfolio.  *Management, through its Asset Quality Committee, comprised of several members of executive management as well as the chief collection officer, evaluates the adequacy of the*

*allowance on a quarterly basis. Adjustments are made at this time to a level deemed adequate by the Committee*, based on its risk evaluation of the portfolio in its entirety as well as in specific loan details. The allowance is comprised of *both individual valuation allowances and loan pool valuation allowances.*

*The Bank monitors its entire loan portfolio on a regular basis, with consideration given to detailed analysis of classified loans, repayment patterns, probable incurred losses, past loss experience, current economic conditions and various types of concentrations of credit. Additions to the allowance are charged to expense and realized losses, net of recoveries, are charged to the allowance.*

Individual valuation allowances are established in connection with specific loan reviews and the asset classification process, including the procedures for impairment testing under Statement of Financial Accounting Standard ("SFAS") No. 114, "*Accounting by Creditors for Impairment of a Loan*", an Amendment of SFAS Statements No. 5 and 15, and SFAS No. 118, "*Accounting by Creditors for Impairment of a Loan - Income Recognition and Disclosures*", an Amendment of SFAS Statement No. 114. Such valuation, which includes a review of loans for which full collectibility in accordance with contractual terms is not reasonably assured, considers the estimated fair value of the underlying collateral less the costs to sell, if any, or the present value of expected future cash flows, or the loan's observable market value. Any shortfall that exists from this analysis results in a specific allowance for the loan. Pursuant to our policy, loan losses must be charged-off in the period the loans, or portions thereof, are deemed uncollectible. Assumptions and judgments by management, in conjunction with outside sources, are used to determine whether full collectibility of a loan is not reasonably assured. Assumptions and judgments also are used to determine the estimates of the fair value of the underlying collateral or the present value of expected future cash flows or the loan's observable market value. Individual valuation allowances could differ materially as a result of changes in these assumptions and judgments. Individual loan analyses are periodically performed on specific loans considered impaired. The results of the individual valuation allowances are aggregated and included in the overall allowance for loan losses.

In addition to estimating losses for loans individually deemed to be impaired, management also estimates collective impairment losses for

—

pools of loans that are not specifically reviewed.   Statistical information regarding the Bank's historical loss experience over a period of time believed to be relevant is weighted very heavily in management's estimate of such losses.  However, future losses could vary significantly from those experienced in the past.  In addition, management also considers a variety of general qualitative factors and then subjectively determines the amount of weight to assign to each in estimating losses.  The factors include, among others, national and local economic conditions, environmental risks, trends in volume and terms of loans, concentrations of credit, changes in lending policies and procedures, and experience, ability, and depth of the Bank's lending staff.  Because of the nature of the factors and the difficulty in assessing their impact, management's resulting estimate of losses may not accurately reflect actual losses in the portfolio.

Although the allowance for loan losses has two separate components, one for impairment losses on individual loans and one for collective impairment losses on pools of loans, the entire allowance for loan losses is available to absorb realized losses as they occur whether they relate to individual loans or pools of loans.  At June 30, 2008 and December 31, 2007, management believed the allowance for loan losses had been established and maintained at a level adequate to reflect the probable incurred losses in the Bank's loan portfolio.

In addition, the 2008 Q2 Form 10-Q disclosed:

Concentration of loan portfolio

The Bank generally invests a large proportion of its assets in loans secured by commercial and residential real estate properties.  While we do not expect a substantial decline in real estate values and economic conditions on Long Island and in the New York metropolitan area, a decline in these values or economic activities could have an impact on the value of collateral securing the loans as well as the ability for the repayment of loans.  See a further discussion in "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" under "Loans".

*The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System and the FDIC have observed that commercial real estate is an area in which some banks have become increasingly concentrated.   These agencies support*

21

> *banks serving a vital role in their communities by supplying credit*
> *for business and real estate development. However, the agencies are*
> *concerned that rising commercial real estate loan concentrations*
> *may expose institutions to unanticipated earnings and capital*
> *volatility in the event of adverse changes in commercial real estate*
> *markets.      As a result of this concern, the agencies issued*
> *Commercial Real Estate Guidance ("CRE guidance") in December*
> *2006 to ensure that institutions with such concentrations maintain*
> *strong risk management practices and appropriate levels of capital.*
> This CRE guidance does not impose any limits on the level of
> commercial real estate lending made by banks.      *The Bank has*
> *incorporated several actions in lending administration as part of its*
> *enhanced credit risk management processes, including the addition*
> *of a credit risk manager and the preparation of concentration*
> *reports for review and determination of risk ratings.*

55.      On September 30, 2008, SBI issued another press release announcing the

completion of a private issuance of 1,965,000 common shares. That stock offering raised $26.3

million in net proceeds.

56.      On October 7, 2008, SBI filed a Form S-3 registration statement (the "2008

Registration Statement") with the SEC offering to sell up to 3,000,000 of its common shares

from time to time. The 2008 Registration Statement, which was signed by Rock, also offered to

sell up to 1,965,000 SBI common shares owned by shareholders who acquired such shares in a

private placement that occurred on September 29, 2008.

57.      On October 27, 2008, SBI issued a press release announcing its earnings for the

quarter ended September 30, 2008, which stated, in pertinent part as follows:

> Smithtown, NY, October 27, 2008 - Smithtown Bancorp (NASDAQ:
> SMTB), the parent company of Bank of Smithtown, today announced
> that the Company had earnings for the third quarter of 2008 of
> $4,607,000 or $.47 per share. These figures represent a 21% increase
> in net income and a 21% increase in diluted earnings per share on a

22

year-over-year basis, and a 17% increase in net income and an 18% increase in diluted earnings per share on a linked-quarter basis. Diluted earnings per share for the last twelve months now stand at $1.59. Return on average equity for the last twelve months was 18.31%.

\*   \*   \*

*Asset quality remained very strong.* Nonperforming loans were $2.8 million or .19% of total loans at the end of the quarter. Loans 30-89 days past due were at $432,000, or .03% of total loans. Net charge-offs for the third quarter were $90,316, resulting from the charge-off of one "small business" line of credit. This charge-off represents less than .01% of average total loans during the third quarter. Net loan charge-offs for the first nine months were $91,346, also representing less than .01% of average total loans for the period. The Bank does not have any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates. In addition, the Bank does not hold any Fannie Mae or Freddie Mac preferred stock.

The Company's capital ratios, which have always been strong and in the "well-capitalized" range, grew even stronger as a result of the Company's completion of its $27.5 million capital offering at the end of the quarter. At September 30th, Tier I Leverage stood at 9.37%, Tier I Risk-Based Capital at 11.13% and Total Risk-Based Capital at 12.00%. The Company also filed a "shelf registration" which, when approved, will give the Company the ability to issue up to 3 million additional common shares in a public offering. The Company has no present intention to issue any additional common shares, but felt that the often-used tool of a "shelf registration" was a prudent step to take, particularly in light of the recent volatile economic conditions.

Defendant Rock commented on the results, stating in pertinent part as follows:

Even during economic hard times there are good loans to be made. The challenge is to find them, and to have the capital and funding needed to make the loans. Because we don't have any sub-prime mortgages, option ARMs, Fannie or Freddie stock and the other kinds of assets that caused losses to so many of our competitors, we have money to lend and capital to support the growth. So, this has been a time of opportunity for us.

23

\*   \*   \*

*We are also pleased with the results from our recent capital offering. Despite the 'financial crisis' atmosphere, we were able to raise the full amount of capital we sought at a price that was consistent with the discounts in other similar transactions at the time.   The alternative for us during the third quarter was plain: stop growing. We could be happy that we don't have the problems that have hurt others,* and shift to a 'standstill' position to ride out the balance of the storm. Such a choice would also bring the growth in shareholder value to a halt. We decided instead that the opportunities created by these turbulent times are too good to turn away. *The fact that we were one of the few community banking companies able to raise private capital in these times of economic distress represents a recognition of our Company's consistently strong performance over a long period of time. We also feel that the significant earnings growth during the third quarter demonstrates that the opportunities in the marketplace are worthwhile.*

58.     In response to Defendants' statements, the price of SBI common stock rose 9.5%, to close at $18.29 per share.

59.     On November 7, 2008, SBI filed with the SEC its Form 10-Q for the quarter ended September 30, 2008, (the "2008 Q3 Form 10-Q"), which was signed by Rock.  This form included SBI's financial statements for the quarter ended September 30, 2008, which were represented to have been presented in conformity with U.S. GAAP.  In addition, the 2008 Q3 Form 10-Q represented that:

- *In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.*

- Our determination of the allowance for loan losses is a critical accounting estimate because it is based on our subjective evaluation of a variety of factors at a specific point in time and involves difficult and complex judgments about matters that are inherently uncertain.  In the event that

24

management's estimate needs to be adjusted based on, among other things, additional information that comes to light after the estimate is made or changes in circumstances, such adjustment could result in the need for a significantly different allowance for loan losses and thereby materially impact, either positively or negatively, the Bank's results of operations.

The allowance for loan losses is established and maintained through a provision for loan losses based on probable incurred losses inherent in the Bank's loan portfolio. *Management, through its Asset Quality Committee, comprised of several members of executive management as well as the chief collection officer, evaluates the adequacy of the allowance on a quarterly basis. Adjustments are made at this time to a level deemed adequate by the Committee,* based on its risk evaluation of the portfolio in its entirety as well as in specific loan details. The allowance is comprised of both individual valuation allowances and loan pool valuation allowances.

*The Bank monitors its entire loan portfolio on a regular basis, with consideration given to detailed analysis of classified loans, repayment patterns, probable incurred losses, past loss experience, current economic conditions and various types of concentrations of credit. Additions to the allowance are charged to expense and realized losses, net of recoveries, are charged to the allowance.*

Individual valuation allowances are established in connection with specific loan reviews and the asset classification process, including the procedures for impairment testing under Statement of Financial Accounting Standard ("SFAS") No. 114, "*Accounting by Creditors for Impairment of a Loan*", an Amendment of SFAS Statements No. 5 and 15, and SFAS No. 118, "*Accounting by Creditors for Impairment of a Loan - Income Recognition and Disclosures*", an Amendment of SFAS Statement No. 114. Such valuation, which includes a review of loans for which full collectibility in accordance with contractual terms is not reasonably assured, considers the estimated fair value of the underlying collateral less the costs to sell, if any, or the present value of expected future cash flows, or the loan's observable market value. Any shortfall that exists from this analysis results in a specific allowance for the loan. Pursuant to our policy, loan losses must be charged-off in the period the loans, or portions thereof, are deemed uncollectible. Assumptions and judgments by management, in conjunction with outside sources, are used to determine whether full collectibility of a loan is not reasonably assured. Assumptions and

judgments also are used to determine the estimates of the fair value of the underlying collateral or the present value of expected future cash flows or the loan's observable market value. Individual valuation allowances could differ materially as a result of changes in these assumptions and judgments. Individual loan analyses are periodically performed on specific loans considered impaired. The results of the individual valuation allowances are aggregated and included in the overall allowance for loan losses.

In addition to estimating losses for loans individually deemed to be impaired, management also estimates collective impairment losses for pools of loans that are not specifically reviewed. Statistical information regarding the Bank's historical loss experience over a period of time believed to be relevant is weighted very heavily in management's estimate of such losses. However, future losses could vary significantly from those experienced in the past. In addition, management also considers a variety of general qualitative factors and then subjectively determines the amount of weight to assign to each in estimating losses. The factors include, among others, national and local economic conditions, environmental risks, trends in volume and terms of loans, concentrations of credit, changes in lending policies and procedures, and experience, ability, and depth of the Bank's lending staff. Because of the nature of the factors and the difficulty in assessing their impact, management's resulting estimate of losses may not accurately reflect actual losses in the portfolio.

Although the allowance for loan losses has two separate components, one for impairment losses on individual loans and one for collective impairment losses on pools of loans, the entire allowance for loan losses is available to absorb realized losses as they occur whether they relate to individual loans or pools of loans. At September 30, 2008 and December 31, 2007, management believed the allowance for loan losses had been established and maintained at a level adequate to reflect the probable incurred losses in the Bank's loan portfolio.

60.    On December 1, 2008, the 2008 Registration Statement was declared effective by the SEC.

61.    On January 28, 2009, SBI issued a press release announcing its earnings for the quarter ended and year ended December 31, 2008, which stated, in pertinent part as follows:

26

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the year 2008 of $15,723,044, a record level of net income, and a 10% increase over the prior year. This achievement marks the Company's 14th consecutive year of record earnings. These earnings also reflect fully-diluted earnings per share for the year of $1.55, a 5% increase over fully diluted EPS for the prior year.

Earnings for the fourth quarter of 2008 were $3,590,010, or $.31 per share. These earnings reflect a 6% increase over the fourth quarter of last year. These fully-diluted earnings per share represent an 11% decrease as compared with the same period last year as a result of the Company's common stock offering that was completed at the end of the third quarter.

*   *   *

Fourth quarter earnings were reduced by an OTTI [other than temporary impairment] write-down of one trust-preferred pool security. All payments of principal and interest on the security have continued to be made, but "mark-to-market" accounting rules nonetheless require that the security be written down because of the deterioration of the credit quality of the banks in the pool and a diminution of the collateral backing the payment stream. The security was written down by approximately $865,000 to a fair value at 12/31/08 of $825,844. The Bank owns one other trust-preferred pool security in the principal amount of $1,994,416. This security was not "other than temporarily impaired" at year-end as a result of management's analysis of the continued payments, the credit quality of the banks in the pool, the collateral depth and the expected cash flows. Excluding the OTTI write-down of one security, the Company's net income for the fourth quarter would have been up by 21% (rather than up 6%) and fourth quarter EPS would have been the same as last year.

*   *   *

*All of the Bank's credit quality ratios continue to be significantly better than those of peer group banks.* Nonperforming loans at year-end were at $5.26 million, or .31% of total loans. This figure increased from the previous quarter's end primarily as a result of adding five related three-family homes. The borrower has reported that he has contracts to sell the homes for sums sufficient to satisfy the

27

debts, but whether those sales are concluded or whether the Bank will have to foreclose the mortgages remains to be seen. In spite of this small increase, the .31% nonperforming loan ratio compares very favorably to the peer group ratio of 1.88%.

Loans 30-89 days past due were at $5.23 million, or .31% of total loans also. Similarly, this figure has increased from the previous quarter's end as a result of adding two single-family homes. The borrowers have received offers to purchase the homes at prices that exceed the amount of the debts, but whether those sales will be concluded or whether the Bank will have to foreclose remains to be seen. Again, in spite of this increase, the .31% ratio compares very favorably with the peer group ratio of .94%.

*   *   *

Net charge-offs for the fourth quarter were approximately $56,000. Net charge -offs for the year 2008 were approximately $147,000, with $87,000 of these being attributable to loans and $60,000 attributable to the Bank's overdraft protection program. The combined total net charge-offs represent less than .01% of average loans.

Defendant Rock commented on the results, stating in pertinent part as follows:

This past year was the most difficult year for our nation's economy and financial companies since the 1930's. In spite of the 'financial crisis' conditions, we grew earnings at a double-digit pace and significantly expanded our market share. We did so by maintaining those parts of our strategy that worked well in the past, and by shifting other parts of our strategy to take advantage of opportunities created by the year's unusual events and circumstances.

We shifted away from construction lending to reduce the risks created *by a slumping housing market and ailing economy*. We increased multifamily lending to replace the construction loans with loans that historically have the lowest loss ratios, even during hard economic times. We also increased multi-family lending and other permanent mortgage lending to take advantage of competitive opportunities in our market area.

*   *   *

28

Financial stocks were battered during the course of the year by the steady barrage of bad economic news and, although Smithtown Bancorp was no exception, our Company's strong performance helped the shares fare better than those of most financial companies. All three major stock indexes were 'underwater' for all 253 trading days during 2008. The S&P 500 was down 39%, the worst year in more than seven decades. The SNL index for Northeast banks was down 45%. The price for Smithtown Bancorp shares was down 27.66%, a hard hit to be sure, but nonetheless a demonstration of some resilience compared to other companies.

We do not and could not know what the year ahead holds for our nation's economic system. The new President and Congress have promised an entire revamping of the financial regulatory system and other sweeping economic changes. Some think that we have not yet seen the worst of the 'financial crisis' and that 2009 will be worse than 2008. Others think that changes will take hold and by mid-year we will begin to turn a corner toward more normalcy in our economy.

In any event, no matter what economic conditions lie ahead, we are confident that we will continue our 100 years of strength and stability. When the nation emerges from the current 'financial crisis', we will be even better positioned than before to provide the lending and deposit services that our customers need, and to build the shareholder value that has been the hallmark of our Company for so many years.

62.     On March 12, 2009, SBI filed with the SEC its Form 10-K for the year ended

December 31, 2008 (the "2008 Form 10-K"), which Rock signed. The 2008 Form 10-K included

SBI's financial statements for the year ended December 31, 2008, which represented, in part:

- *The accounting and reporting policies of Smithtown Bancorp, Inc. and its bank subsidiary, Bank of Smithtown, reflect banking industry practices and conform to U.S. generally accepted accounting principles.*

- *The allowance for loan losses is a valuation allowance for probable incurred credit losses. Loan losses are charged against the allowance when management believes the uncollectibility of a loan balance is confirmed. Subsequent recoveries, if any, are credited to the allowance. Management estimates the allowance balance required using past loan loss experience, the nature and volume of the portfolio, information*

29

*about specific borrower situations and estimated collateral values,*
*economic conditions and other factors.  Allocations of the allowance*
*may be made for specific loans, but the entire allowance is available for*
*any loan that, in management's judgment, should be charged off.*

The allowance consists of specific and general components.  The
specific component relates to loans that are individually classified as
impaired or loans otherwise classified as substandard or doubtful.  The
general component covers non-classified loans and is based on
historical loss experience adjusted for current factors.

A loan is considered impaired when, based on current information and
events, it is probable that the Bank will be unable to collect the
scheduled payments of principal or interest when due according to the
contractual terms of the loan agreement.   Factors considered by
management in determining impairment include payment status,
collateral value and the probability of collecting scheduled principal
and interest payments when due.  Loans that experience insignificant
payment delays and payment shortfalls generally are not classified as
impaired.  Management determines the significance of payment delays
and payment shortfalls on a case-by-case basis, taking into
consideration all of the circumstances surrounding the loan and
borrower, including the length of the delay, the reasons for the delay,
the borrower's prior payment record and the amount of the shortfall in
relation to the principal and interest owed.  Impairment is measured on
a loan by loan basis for commercial and construction loans by either
the present value of expected future cash flows discounted at the
loan's effective interest rate, the loan's obtainable market price, or the
fair value of the collateral if the loan is collateral dependent.  Large
groups of smaller balance homogeneous loans are collectively
evaluated for impairment.  Accordingly, the Bank does not separately
identify individual consumer and residential loans for impairment
disclosures.

The 2008 Form 10-K also represented:

The Bank generally invests a large proportion of its assets in loans
secured by commercial and residential real estate properties on Long
Island and the New York metropolitan area.  While the Company does
not expect a substantial decline in real estate values and economic
conditions on Long Island and in the New York metropolitan area, a
decline in these values or economic activities could have an impact on

the value of collateral securing the loans as well as the ability for the repayment of loans. In addition, at December 31, 2008, construction loans represented 23% of the Company's loan portfolio and multi-family loans represented 18% of its loan portfolio. See a further discussion in "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" under "Loans".

*The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System and the FDIC have observed that commercial real estate is an area in which some banks have become increasingly concentrated. These agencies support banks serving a vital role in their communities by supplying credit for business and real estate development. However, the agencies are concerned that rising commercial real estate loan concentrations may expose institutions to unanticipated earnings and capital volatility in the event of adverse changes in commercial real estate markets.* As a result of this concern, the agencies issued Commercial Real Estate Guidance ("CRE Guidance") in December 2006 to ensure that institutions with such concentrations maintain strong risk management practices and appropriate levels of capital. This CRE Guidance does not impose any limits on the level of commercial real estate lending made by banks. The Bank has incorporated several actions in lending administration as part of its enhanced credit risk management processes, including the addition of a credit risk manager and the preparation of concentration reports for review and determination of risk ratings.

63.     On April 29 2009, SBI issued a press release announcing its earnings for the

quarter ended March 31, 2009, which stated, in pertinent part as follows:

Smithtown, NY, April 29, 2009 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the first quarter of 2009 of $3,616,425, or $.31 per share. These figures reflect a 1% increase in net income over the first quarter of last year, and a 16% decrease in fully-diluted earnings per share over the same period last year as a result of the Company's common stock offering that was completed at the end of the third quarter of 2008.

*       *       *

31

*All of the Bank's credit quality ratios continue to be significantly better than those of peer group banks.* Nonperforming loans at quarter-end were at $8.4 million, or .46% of total loans. This figure increased from the previous quarter's end primarily as a result of adding one home loan that is presently under foreclosure. A written offer has been made by a third party to purchase the property for an amount sufficient to satisfy the debt, but whether that sale will be concluded or whether the Bank will have to complete its foreclosure of the mortgage remains to be seen. During the first quarter, under similar circumstances, the Bank's borrowers sold three homes for amounts which satisfied the debts on those properties in full, thereby eliminating those loans from the nonperforming category prior to completion of the foreclosure. In any event, in spite of this small increase, the .46% nonperforming loan ratio compares very favorably to the ratio of 2.40% for the peer group of 293 banks in the nation with assets from $1 billion to $3 billion.

Defendant Rock commented on the results, stating in pertinent part as follows:

During these difficult times, which many observers think is at or near the bottom of the economic cycle, we believe that we are not only weathering the storm around us, but also taking advantage of opportunities to emerge from the 'financial crisis' as one of the winners for the future.

Changes in the competitive marketplace have created favorable opportunities for growth, both in core deposits and loans. We are seeking to take advantage of those opportunities, even if it means moderating income growth during these difficult times, in order to create a more valuable franchise for the future. So, for example, early in the first quarter, when the core deposit inflows were so rapid that we could not employ the funds profitably at the same pace, nonetheless, we chose not to take steps to slow or stop the inflows, in spite of the downward pressure on the margin.

Fortunately, as we look to the future, both factors that created downward pressure on the net interest margin during the first quarter seem to be in the past. The Fed interest rate cuts, though they have taken their toll, would seem to be done. And with respect to the investment of deposit inflows, net loan growth has caught up with, and passed by, net deposit growth. For the month of January, deposit growth was $147 million while loan growth was $19 million. By

32

> February, deposit growth was $67 million and loan growth was $61 million. For the first three weeks of April, deposit growth was $12 million and loan growth was $66 million. So, as a result of our increasing ability to employ the funds and the likelihood that Fed interest rate cuts have come to an end, we expect that the margin has bottomed out and may gradually begin to increase over time.

64.   On May 8, 2009, SBI filed with the SEC its Form 10-Q for the quarter ended March 31, 2009 (the "2009 Q1 Form 10-Q"), which Rock signed. The 2009 Q1 Form 10-Q included SBI's financial statements for the quarter ended March 31, 2009, which were represented to have been presented in conformity with U.S. GAAP. In addition, the 2009 Q1 Form 10-Q represented that:

> In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

65.   On July 29, 2009, SBI issued a press release announcing its earnings for the quarter ended June 30, 2009, which stated, in pertinent part:

> Smithtown, NY, July 29, 2009 - Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the second quarter of 2009 of $3.413 million, or $.26 per share, beating analyst estimates by 2 cents per share, but down compared to $.31 per share during the first quarter of this year. Earnings were reduced by the industry-wide FDIC special assessment during the second quarter to replenish losses to the deposit insurance fund caused by bank failures during the past year. In addition to its regular quarterly deposit insurance premiums, Bank of Smithtown incurred a one-time special assessment of approximately $1.1 million in the second quarter. Without this charge, earnings would have been $4.052 million, up 12% from the previous quarter. EPS would have been $.31, including the impact of the additional shares issued on May 20th in connection with the Company's $30 million common stock offering.

Defendant Rock commented on the results, stating in pertinent part as follows:

> Given the difficulties of these economic times, we believe that our results for the quarter are moderately successful. *We have a strong capital base, we continue to grow loans and core deposits at a strong pace, and we continue to grow our revenue.* Expenses are higher than we would like, but most of that is attributable to economic factors beyond our control, such as unprecedented FDIC insurance costs. Without these costs, we would be growing net income at a double-digit pace, which would make the additional capital we have raised accretive to earnings per share quickly.
>
> With respect to asset quality, as I have said previously, in this economic environment, we expect the number of slow-paying and non-paying customers to be higher than usual for a while. With more than five million people having lost their jobs and more than 6,000 bankruptcies being filed every day, it would be unrealistic for us to expect that none of those events will touch Bank of Smithtown. *At the same time, however, because 97% of our loans are secured by mortgages on real estate, usually protected with wide loan-to-value ratios, we do not expect large, unmanageable losses in spite of the dim economic environment.*
>
> At the same time we weather the difficulties of the 'Great Recession', we continue to take advantage of marketplace disruptions to build our customer base on both the loan and deposit sides of the ledger. Our new branches have been very successful, helping us to grow core deposits by 53% over the last twelve months. We fully expect the new branches that open later this year and next year will be equally successful.

66.     In July 2009, Rock was interviewed for an article published in that month by

*Kiplinger's Personal Finance* magazine. In the interview, Rock stated that the Bank experienced

only one mortgage delinquency in its entire portfolio of mortgage loans. He also touted the

Bank's strength and future prospects, stating the Bank, and by extension SBI, was "in our best of

times" and that "no [competitor] can really match us."

34

67.     On August 7, 2009, SBI filed with the SEC its Form 10-Q for the quarter ended

June 30, 2009 (the "2009 Q2 Form 10-Q"), which Rock signed.  The 2009 Q2 Form 10-Q

included SBI's financial statements for the quarter ended June 30, 2009, which were represented

to have been presented in conformity with U.S. GAAP.  In addition, the 2009 Q2 Form 10-Q

represented that:

> In the opinion of management, the accompanying unaudited interim
> consolidated financial statements contain all adjustments (consisting of
> normal recurring accruals) necessary to present fairly the Company's
> financial position and its results of operations for the periods
> presented.

68.     On September 24, 2009, SBI filed a Form S-3 registration statement (the "2009

Registration Statement") with the SEC offering to sell from time to time up to $100 million of

unsecured senior or subordinated debt securities; common shares; preferred shares; depositary

shares; warrants to purchase other securities; and units consisting of any combination of the

above securities.  The 2009 Registration Statement also offered to sell up to 475,000 SBI

common shares issuable upon the exercise of warrants purchased in private placements by

selling shareholders on June 29, 2009 and July 27, 2009.

69.     On November 2, 2009, SBI issued a press release announcing its earnings for the

quarter ended September 30, 2009, which stated, in pertinent part as follows:

> Smithtown, NY, November 2, 2009 - Smithtown Bancorp (NASDAQ:
> SMTB), the parent company of Bank of Smithtown, today announced
> earnings for the third quarter of 2009 of $897,723, or $.06 per share.
> ***Earnings were reduced by a provision of $10 million to the loan loss
> reserve.***  Net income for the first nine months of this year was $7.927
> million, or $.59 per share.  Fully diluted earnings per share for the last
> twelve months now stand at $.89.

35

Defendant Rock commented on the results, stating in pertinent part as follows:

> ***Earnings were negatively impacted during the third quarter by two factors*** related to the continued economic recession.  First, as many Long Island economists have agreed, the various impacts of ***the recession*** appear to have hit this region later than in other parts of the country.  Second, as has been observed frequently by the Federal Reserve and in financial journals, ***commercial real estate difficulties*** appear to be surfacing later in the cycle than other manifestations of the recession (such as job losses, home foreclosures and reduced retail sales).
>
> Although nonperforming loans and charge-offs remain better than peer bank averages, we nonetheless have to increase loan loss provisions to protect against possible future losses based upon the deterioration observed in our loan portfolio during the third quarter.  ***We also expect levels of nonperforming loans, loan loss provisions and charge-offs to continue to be higher than usual during the fourth quarter of this year and possibly into the first quarter of next year as commercial real estate markets and the region's economy continue to struggle.***
>
> But as earnings lag behind our historical success due to the economic woes of the nation and the region, ***we nonetheless continue to show strong signs of building a valuable franchise.***  Core deposits have grown this year by 46%, with total deposits now exceeding $2 billion.  We continue to identify and open successful new branch locations at a reasonable cost, as borne out by both our deposit figures and expense ratios.  When we look at the steadily-increasing stream of net interest income we are building by matching strong core deposit growth with permanent mortgage lending, we feel that when economic conditions permit us to return to more normalized provisions, we will have a Company with solid earnings growth and an excellent deposit franchise.

70.     As a result of these disclosures, the price of SBI stock declined from a closing price on the previous trading day of $10.35 per share to $8.91 on November 2, 2009, an approximate 14% decline.  After November 2, 2009, the price of SBI common stock continued to decline.

36

71.     On November 19, 2009, in the wake of its dismal performance in the third quarter

of 2009, SBI announced that:

- John Romano was named President and Chief Operating Officer of SBI and the Bank. Mr. Romano had served as an Executive Vice President of SBI and the Bank, and the Chief Retail Officer of the Bank, since February 2000;

- Christopher Becker was named Executive Vice President and Chief Financial Officer of the SBI and the Bank. Mr. Becker had served as an Executive Vice President of the Bank since April 2009; and

- Defendant Anita Florek was named Executive Vice President of the Bank and the Chief Accounting Officer of SBI and the Bank.

72.     On December 22, 2009, SBI issued a press release announcing its Board of

Directors had decided not to declare a cash dividend for the fourth quarter of 2009.  Defendant

Rock stated in pertinent part as follows:

> *We expect elevated levels of nonperforming loans and loan loss provisions for the near future*, as well as other challenges posed by the current economic and regulatory environment.  Therefore, *we believe that this is a time to conserve capital*.  During the last recession and real estate downturn of the early 1990's, the Company took similar steps by temporarily halting the cash dividend, and subsequently emerged stronger and more profitable.  *We believe that the fundamentals of the Company remain sound, and once we work through the problem credits precipitated by the recession and current real estate downturn*, we expect to return to levels of profitability more consistent with the past.

73.     As a result of these disclosures, the price of SBI stock declined by approximately

7.5% to $4.65 per share to $8.91 on December 22, 2009.

37

74.     Separately and as a whole, the statements referenced above in paragraphs 46

through 73 were materially false and misleading when made because they failed to disclose the

following adverse facts, which were known to Defendants or recklessly disregarded by them:

a)      that SBI's financial results were artificially inflated due to SBI's material
        understatement of its loan loss reserves and SBI's failure to state certain of its
        assets at their true fair value;

b)      that SBI intentionally and improperly delayed the recognition of impairments of
        its assets in order to inflate its reported income and asset quality;

c)      that SBI's internal and disclosure controls were grossly deficient and flagrantly
        violated;

d)      that SBI, through its subsidiary, was engaged in a conscious effort to conceal the
        true extent of its loan losses, including by making unsound extensions of new
        credit to distressed borrowers to enable them to make payments on pre-existing
        debts to the Bank;

e)      that SBI deliberately delayed the completion of property appraisal reports to avoid
        recognition of losses in its financial statements for the third quarter of 2009;

f)      as a result of the foregoing, SBI's financial statements were not fairly presented in
        conformity with U.S. GAAP and were materially false and misleading; and

g)      based on the foregoing, Rock lacked a reasonable basis for his positive statements
        about the Company, its prospects and growth.

75.     The above-referenced disclosures and filings falsely represented, *inter alia*, SBI's

earnings, capitalization, loan losses, loan delinquencies, and effectiveness of SBI's internal

controls.

76.     During the relevant period, SBI and Rock knowingly and materially misled the

investing public, thereby inflating the price of SBI common stock, by publicly issuing false and

misleading statements and by failing to disclose material facts necessary to make Defendants'

of the country.  Nonperforming loans ended the quarter at $130.2 million, or 6.23% of total loans.  Loans 30-89 days past due decreased from $51.2 million at the end of the third quarter to $20.8 million, or .99% of total loans, at the end of the fourth quarter.  Net charge-offs for the fourth quarter were $22.6 million and for the year were $23.8 million, or 1.22% of average loans.

The 2009 Q4 Press Release also disclosed:

> *The Company further announced that, on January 29, 2010, its subsidiary, Bank of Smithtown, entered into a Consent Agreement with the Federal Deposit Insurance Corporation (FDIC) and a parallel Consent Order with the New York State Banking Department (NYSBD), hereinafter collectively referred to as the "Consent Agreement."*
>
> *   *   *
>
> Regarding the Consent Agreement with the FDIC and NYSBD, the *Bank is required to improve credit administration, loan underwriting and internal loan review processes and maintain an adequate allowance for loan losses.  Other required actions include the implementation of plans to reduce classified assets, decrease the Bank's concentration in commercial real estate loans and increase profitability.  The Bank's payment of dividends and growth in average assets require prior approval of the FDIC and NYSBD.  In addition, the Bank is required to maintain no later than June 30, 2010, Tier 1 Capital at least equal to 7% of Total Assets, Tier 1 Risk-Based Capital at least equal to 9 percent of Total Risk-Weighted Assets and Total Risk-Based Capital at least equal to 11 percent of Total Risk-Weighted Assets.*

## INJURY TO PLAINTIFF

79.     During the relevant period, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff.  As described herein, during the relevant period, SBI and Rock knowingly made or caused to be made a series of materially false

or misleading statements about SBI's business, prospects, and operations. These material misstatements and omissions had the effect of creating an unrealistically positive assessment of SBI and its business, prospects, and operations in the market. This in turn caused the Company's common stock to be overvalued and artificially inflated at all relevant times and resulted in Plaintiff purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

80.     The material misrepresentations and omissions particularized in this Complaint were made willfully and wantonly, and targeted Plaintiff as well as the public generally.

## AS AND FOR THE FIRST CAUSE OF ACTION
(Plaintiff against SBI and Rock)
(Fraud)

81.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 80 as if fully set forth herein.

82.     SBI and Rock knowingly made the material misrepresentations alleged above, including, without limitation, misrepresentations concerning the Bank's loan losses, delinquent loans, capitalization, quarterly earnings, and financial soundness, with the knowledge that such representations were false and with the specific intent of inducing Plaintiff to purchase SBI shares at prices artificially inflated by the misrepresentations of SBI and Rock, as alleged above.

83.     SBI and Rock also knowingly failed to state facts required to make the facts disclosed not misleading, as set forth in paragraphs 1 through 81 above, including, without limitation, the failure of SBI and Rock to inform Plaintiff of the extent of the Bank's delinquent loans, inadequate capitalization, knowing reliance on fraudulent appraisals, efforts to shift

41

damaging appraisal information into subsequent quarters, lower-than-reported earnings, and

questionable financial soundness.

84.    Plaintiff reasonably relied upon such misrepresentations and omissions, suffering

loss thereby.

### AS AND FOR THE SECOND CAUSE OF ACTION
(Plaintiff against Rock Jr.)
(Aiding and Abetting Fraud)

85.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

through 84 as if fully set forth herein.

86.    Rock Jr. had extensive information concerning the status and performance of the

Bank's loan portfolio, and was aware of the falsity of the Bank's statements, set forth above,

concerning its loan losses, earnings, capitalization, and financial condition.

87.    Rock Jr. provided substantial assistance to SBI and Rock in carrying out the fraud

set forth above, by, *inter alia*, providing borrowers with "interest reserve advances" to foster the

illusion that delinquent and distressed borrowers were timely paying their debts to the Bank,

knowingly utilizing fraudulent and inflated appraisals in connection with the loan approval

process, knowingly engaging in a pattern of reckless loan approvals in order to meet the loan

growth imperatives of Bank management, and conferring with Rock regarding lending decisions

in such a manner as to circumvent and subvert the Bank's loan committee process.

WHEREFORE, Plaintiff requests an Order (i) awarding Plaintiff compensatory damages

in the amount of $10,000,000, or in an amount to be determined at trial, such amount to include

Plaintiff's direct and consequential damages as a result of the conduct set forth herein; (ii)

42

awarding Plaintiff punitive damages in the amount of $100 million, or in an amount to be determined at trial; (iii) permanently enjoining Defendants from engaging in material misrepresentations concerning the capitalization, earnings, loan losses, or financial health of SBI or of the Bank; and (iv) reasonable costs and expenses incurred in this action, including, to the extent applicable, counsel fees, and such other relief as the Court deems just and proper.

Dated:     New York, New York
           April 22, 2010

CHADBOURNE & PARKE LLP

By_____

           Scott S. Balber
           Jonathan C. Cross

30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

*Attorneys for Plaintiff Robert I. Toussie*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

ROBERT I. TOUSSIE,

                                    Plaintiff,

            -against-

SMITHTOWN BANCORP, INC., BRADLEY E.
ROCK, SR., and BRADLEY E. ROCK, JR.,

                                    Defendants.

---

Index No.

**COMMERCIAL DIVISION
ATTORNEY'S
CERTIFICATION**

---

      Scott S. Balber, an attorney duly admitted to practice law before the Courts of the

State of New York, hereby affirms the following statements to be true under the penalties of

perjury.

      (1)  I am the attorney for the Plaintiff, ROBERT I. TOUSSIE, and submit this

affirmation in support of assignment of this action to the Commercial Division.

      (2)  This case involves allegations of fraud and misrepresentation involving the

business affairs of a consumer and commercial banking institution.

      (3)  I am fully familiar with the facts and pleadings in this action and have reviewed

the Rules of the Commercial Division, Kings County, including the Guidelines for the

Assignment of Cases to a Commercial Part.

(4)  I believe that this case complies with the Guidelines for the Assignment of Cases

to a Commercial Part and should be assigned to the Commercial Division.

Dated:      New York, New York
            April 22, 2010

                                    CHADBOURNE & PARKE LLP

                                    By_____
                                            Scott S. Balber
                                            A Member of the Firm
                                    Attorneys for Plaintiff
                                    30 Rockefeller Plaza
                                    New York, New York  10112
                                    (212) 408-5100

2